**VERMONT RIGHT TO LIFE COMMITTEE, INC.,**
Plaintiff,

v.

William H. SORRELL, in his official capacity as Vermont Attorney General; John T. Quinn, William Wright, Dale O. Gray, Lauren Bowerman, Jan Paul, James Hughes, Linda P. Effel, Joel W. Page, James D. McKnight, Jane Woodruff, James P. Mongeon, Terry Trono, Dan Davis, and Patricia Zimmerman, in their official capacities as Vermont State's Attorneys; James F. Milne, in his official capacity as Vermont Secretary of State; and Edward W. Haase, in his official capacity as Vermont Commissioner of Taxes, Defendants, and

Vermont Public Interest Research Group, Common Cause/Vermont, League of Women Voters of Vermont, Rural Vermont, Seth Bongartz, Cheryl Rivers, and Marjorie Power, Defendant–Interveners.

No. 2:97–CV–286.

United States District Court,
D. Vermont.

Sept. 9, 1998.

Norman Charles Smith, Bauer, Anderson & Gravel, Burlington, VT, James Bopp, Jr., Richard E. Coleson, Glenn M. Willard, Bopp, Coleson & Bostrom, Terre Haute, IN, for Plaintiff.

Conrad Wesley Smith, Rebecca Mary Ellis, Vermont Attorney General's Office, Timothy Bert Tomasi, Office of Attorney General, Montpelier, VT, for Defendants.

Peter Francis Welch, Welch, Graham & Manby, White River Jct, VT, Stephen D. Whetstone, Inez H. Friedman, John R. Bauer, Testa, Hurwitz & Thibeault, Boston, MA, John C. Bonifaz, Brenda Wright, National Voting Rights Institute, Boston, MA, for Intervenor–Defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

In this civil action for declaratory and injunctive relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, Vermont Right to Life Committee, Inc., ("VRLC") seeks a determination that Vermont's recently-enacted campaign finance reform statutes which regulate political advertising are unconstitutional facially and as applied. Before the Court are the Plaintiff's, Defendants' and Defendant–Interveners' motions for summary judgment.

## BACKGROUND

"Never does the Constitution of the United States loom over the regulatory projects of [the legislative and executive branches] more conspicuously than when they seek to regulate activity protected by the First Amendment." Frank J. Sorauf, *Politics, Experience and the First Amendment: the Case of American Campaign Finance Reform*, 94 Colum. L.Rev. 1348, 1348 (1994). The quest for effective campaign finance reform measures which can withstand First Amendment scrutiny has been conducted over the past twenty-two years in the shadow of the United States Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), which prohibited limits on campaign expenditures, approved limits on campaign contributions, approved reporting and disclosure requirements on campaign contributions, and approved public financing of presidential election campaigns. Whether *Buckley*'s shadow is characterized as protective or obfuscatory has been widely debated. *See, e.g.,* C. Edwin Baker, *Campaign Expenditures and Free Speech*, 33 Harv. C.R.–C.L. L.Rev. 1, 1–2 (1998); David A. Strauss, *Corruption, Equality and Campaign Finance Reform*, 94 Colum. L.Rev. 1369, 1369 (1994); Ralph K. Winter, *The History and Theory of Buckley v. Valeo*, 6 J.L. & Pol'y 93, 94 (1997). What is uncontested is the increasing use, post–*Buckley*, of "soft money" (money raised by political parties free of contribution limits) to engage in "issue advocacy" (communication which primarily promotes ideas or policies as distinguished from "express advocacy" which advocates the election or defeat of a candidate), and the efforts of campaign finance reformers at the state and federal level to regulate this activity consistent with the First Amendment.

Too many commentators on the need for campaign finance reform decry the *Buckley* decision, and proclaim that clean elections and free speech are on a collision course. Witness, for example, House minority leader Richard A. Gephardt's testimony in support of a Constitutional amendment mandating campaign finance reform: "we have two important values in direct conflict: free speech . . . and our desires for healthy campaigns in a healthy democracy. As the [*Buckley*] court has framed it, you cannot have both." *Free Speech and Campaign Finance Reform: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 105th Cong. (1997) (remarks of Richard A. Gephardt, House minority leader), paraphrased in Joel M. Gora, *Campaign Finance Reform: Still Searching Today for a Better Way*, 6 J.L. & Pol'y 137, 175 (1997). On the contrary, a healthy democracy cannot survive without both: the rights to participation in the election process and to freedom of expression and association are the bedrock of our society. In the words of Justice Hugo Black, writing for the Supreme Court: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights . . . are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). In the words of Justice Louis Brandeis: "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; . . . public discussion is a political duty; and . . . this should be a fundamental principle of the American government." *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (concurring opinion, joined by Holmes, J.). James Madison, in his report to the General Assembly of Virginia in 1798 condemning the Sedition Act, stressed the interdependency of these rights:

> Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits of the candidates respectively.

4 *Elliot's Debates on the Federal Constitution* 575 (1876), *quoted in New York Times Co. v. Sullivan*, 376 U.S. 254, 275 n. 15, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

During the 1997 legislative session, in response to concerns about the use of soft money and the increasing cost of state and local election campaigns, the Vermont General Assembly enacted Act 64, a comprehensive campaign finance reform measure. Among other provisions, Act 64 included disclosure requirements for political advertisements, codified at Vt. Stat. Ann. tit. 17, §§ 2881–82 (Supp.1997),[1] and reporting requirements for mass media activities, codified at Vt. Stat. Ann. tit. 17, § 2883 (Supp.1997).[2] Political

---

**1.** The full text of sections 2881 and 2882 are as follows:

**2881. Definitions**

As used in this subchapter, "political advertisement" means any communication, including communications published in any newspaper or periodical or broadcast on radio, television or over any public address system, placed on any billboards, outdoor facilities, buttons or printed material attached to motor vehicles, window displays, posters, cards, pamphlets, leaflets, flyers or other circulars, or in any direct mailing, which expressly or implicitly advocates the success or defeat of a candidate.

**2882. Identification**

All political advertisements shall contain the name and address of the person who paid for the advertisement. The advertisement shall clearly designate the name of the candidate, party or political committee by or on whose behalf the same is published or broadcast. In the case of printed or written matter, the name and address shall be printed or written large enough to be clearly legible, except that this shall not apply to buttons or any written or printed matter attached to or displayed on any motor vehicle.

**2.** The full text of section 2883 is reproduced below.

**2883 Notice of expenditure**

(a) For purposes of this section, "mass media activities" includes television commercials, radio commercials, mass mailings, literature drops and central telephone banks which include the name or likeness of a candidate for office.

(b) In addition to any other reports required to be filed under this chapter, a person who makes expenditures totaling $500.00 or more

advertisements must contain the name and address of the person who paid for the advertisement, and designate the name of the candidate, party or political committee by or on whose behalf it is published. § 2882. "Political advertisement" is defined as "any communication ... which expressly or implicitly advocates the success or defeat of a candidate." § 2881. Mass media activities are certain types of communications which include the name or likeness of a candidate for office. § 2883. Any person who spends $500.00 or more within 30 days of an election must report such expenditures to the secretary of state and to the candidate whose name or likeness is included within 24 hours of making the expenditure. *Id.* The report must include the identity of the person who made the expenditure, the name of the candidate, the amount expended, the purpose, date, and to whom it was paid. *Id.;* Vt. Stat. Ann. tit. 17, § 2803(a); (b) (Supp.1997). A person who violates these statutory provisions is subject to a civil penalty of up to $10,000. Vt. Stat. Ann. tit. 17, § 2806(b) (Supp.1997).

Plaintiff VRLC is a statewide, non-profit Vermont corporation, with its principal office in Montpelier, and local chapters throughout the state. It has approximately 4,500 members. Its stated purpose is to achieve universal recognition and respect for the sanctity of human life from conception through natural death through activities such as public education and legislative lobbying. It publishes the positions of candidates for public office on issues it considers important through newsletters, voter · guides, posters and pamphlets. VRLC gathers information independently of any candidate, party or political committee, and it exerts editorial control over the contents of its communications. It includes its name and address on all of its publications, and does not publish anonymous communications. VRLC has a political committee which maintains a separate bank account and is responsible for endorsing specific candidates and for publishing these endorsements. The political committee and its activities are not involved in this lawsuit.

In its Verified Complaint, VRLC announced that it publishes issue advocacy, that its issue advocacy appears to require it to carry an identifying disclaimer pursuant to Section 2882, that it wishes to continue to publish issue advocacy but without the disclaimer, and that it will not do so without complying. VRLC also announced that it has expended more than $500.00 in issue advocacy through mass media activity, that it wishes to continue to do so without reporting its expenditures, and that it will not engage in such mass media activity without complying with the statutory reporting requirements. The State has not advised VRLC that it is or may be in violation of the reporting and disclosure requirements, and has represented that it considers VRLC to be in compliance or that its activities are not covered by the statutes in question. Defs.' Mot. to Dismiss at 17–19 (paper 27); Defs.' Reply Mem. at 6 (paper 43); Defs.' Mem. in Supp. of Mot. for Summ. J. at 4–7 (paper 66); Defs.' Reply Mem. at 1–5 (paper 85).

In its summary judgment motion, VRLC contends that Sections 2881, 2882 and 2883 are unconstitutionally overbroad or void for vagueness. The Defendants (collectively "the State") oppose summary judgment for VRLC and seek it on their own behalf on the following grounds: 1)failure to present a live case or controversy; 2) failure to prove injury in fact necessary for standing; 3) the statutes' reporting and disclosure requirements are narrowly tailored and withstand Constitutional scrutiny; and, in the alternative, 4) if Constitutionally vulnerable as written, the statutes are readily susceptible to a narrowing construction. The Defendant–Interveners, a group of organizations and individuals who support Act 64, seek summary judgment against VRLC on the grounds of lack of standing and on the merits.

for mass media activities within 30 days of a primary or general election shall report such expenditures to the secretary of state, and to the candidate whose name or likeness is included in the activity, within 24 hours of making the expenditure. The report shall identify the person who made the expenditure with the name of the candidate involved in the activity and any other information relating to the expenditure that is required to be disclosed under the provisions of subsections (a) and (b) of section 2803 of this title.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no material facts in dispute. Fed. R.Civ.P. 56(c); *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir.1997). A party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

### II. STANDING

■ As a threshold matter, this Court must determine whether VRLC has standing to bring this suit. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (requirement that jurisdiction be established as a threshold matter is inflexible and without exception). Article III of the United States Constitution limits this court's subject matter jurisdiction to cases and controversies. A controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 81 L.Ed. 617 (1937). As the United States Supreme Court has noted, "[t]he difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

■ Under the doctrine of standing, the sufficiency of a litigant's stake is examined to determine whether a "real and substantial controversy" exists. A litigant must have suffered an actual or threatened injury ("in-jury in fact"), which can fairly be traced to the challenged action ("causation"), and is likely to be redressed by a favorable decision ("redressability"). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). At each stage of litigation, the party invoking federal jurisdiction bears the burden of establishing these elements of standing. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. At the summary judgment stage, a plaintiff may not rest on general factual allegations of injury, but must set forth specific facts by affidavit or other evidence. *Id.*

■ The State urges this Court to conclude, as a panel of the Seventh Circuit Court of Appeals did in refusing to entertain a challenge to Wisconsin's statute requiring registration of political committees, that this action is nonjusticiable because it calls for an advisory opinion. *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir.) ("WRTL"), *petition for cert. filed*, 67 U.S.L.W. 3083 (July 15, 1998). As if to emphasize the Supreme Court's comment in *Babbitt*, however, another Seventh Circuit panel some two weeks earlier found a similar case from Indiana sufficiently concrete to proceed. *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503 (7th Cir.1998) ("BAPAC"). What distinguished *WRTL* from *BAPAC* were the panels' evaluations of the likelihood and imminence of the threat of enforcement. *WRTL* involved a statute enacted in 1973, which had never been used to prosecute a group such as WRTL, and WRTL was not under a threat of enforcement. *WRTL*, 138 F.3d at 1184–85. In *BAPAC*, a citizens' group had been advised by the County Election Board that its dissemination of information regarding candidates' positions on issues might require its registration as a political committee under a recently enacted statute. *BAPAC*, 137 F.3d at 504–05. Threat of enforcement in the instant case is neither as remote as the threat in *WRTL*, nor as imminent as the threat in *BAPAC*.

■ It is well established that a credible threat of present or future prosecution will confer standing. *Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In the First Amendment context, an actual injury exists when plaintiffs are chilled from exercising their rights to free expression or when they forego expression in order to avoid enforcement consequences. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

■ The injuries wrought by threats of prosecution or enforcement and by self-censorship to avoid enforcement depend then on "a credible threat that the challenged law will be enforced." *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir.1996) ("NHRLPAC"). In *NHRLPAC*, the fact that the state would not rule out enforcement of the statute was sufficient to confer standing. *Id.* at 17. The First Circuit panel examined the "credible threat of prosecution" standard as it has been applied in case law, and concluded that "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 15.

The statutes at issue in the present case are recently enacted, and they facially restrict expressive activity. The State contends that there is no credible threat of enforcement,[3] because it believes that VRLC's activities are not covered by the statutes. The State has not disavowed any intention of enforcing the statutes however. Essentially, in arguing that there is no credible threat of enforcement against VRLC, the State is in reality arguing that VRLC cannot satisfy the first element of standing, that of injury in fact.

### A. *Injury in fact*

■ VRLC has submitted affidavits asserting that it publishes communications that implicitly advocate the success or defeat of candidates, thus meeting Section 2881's definition of "political advertisement." Beerworth Aff. (paper 51). It contends that it does not, and does not wish to, designate the name of the candidate, party or political committee by or on whose behalf its communications are published. VRLC also asserts that it has engaged in mass media activities such as mass mailings, literature drops, and central telephone banks on which it has spent more than $500.00 within thirty days of a primary or general election, and that it wishes to continue to engage in such activity. Verified Complaint, ¶ 16.[4] VRLC claims that it cannot ascertain or accurately report, within 24 hours of making an expenditure, whether it has spent $500.00 or more on such activities. It contends that it does not, and does not wish to, make a campaign finance report in the form mandated by Sections 2883 and 2803 to the state and to every candidate whose name or likeness is included in its mass media communication. Beerworth Decl. (paper 80).

---

**3.** Most of the case law dealing with pre-enforcement First Amendment challenges has involved statutes that provide for criminal as well as civil penalties. Violations of Vermont's statutes regulating political advertising are subject to civil penalties only. Title 17, § 2806(b). Nevertheless, the potential civil penalty is substantial, and presents a significant deterrent to the exercise of expression that would violate the statutes. *See, e.g., Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.) (plaintiff had standing to raise First Amendment challenge to civil statute pre-enforcement where state authorities had not affirmatively disavowed enforcement), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 513, 136 L.Ed.2d 403 (1996); *American Civil Liberties Union v. The Florida Bar*, 999 F.2d 1486, 1492 (11th Cir.1993) (plaintiff had standing to challenge Florida Bar Rule when he

showed reasonable fear of disciplinary action). *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (fear of damage awards may be markedly more inhibiting than fear of prosecution under a criminal statute).

**4.** The allegations of a verified complaint, if made on the basis of personal knowledge, will support a motion for summary judgment. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995). *See also Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir.1998); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir.1996), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 1110, 137 L.Ed.2d 311 (1997); *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir.1991).

The State responds that VRLC is and has been in compliance with the disclosure requirements for political advertisements. It points out that VRLC consistently publishes its name and address on all of its publications and communications, and claims that VRLC does not publish any communications "on behalf of" a candidate, party or political committee. It argues that because VRLC does not publish on behalf of these entities, the second sentence of section 2882 does not apply to VRLC, and it is not required to make any further designation. Even if the second sentence does apply, says the State, VRLC is in compliance, because it publishes the name of the candidate.

As to notification of expenditures on mass media activities, the State claims that VRLC does not engage in such activities, and queries whether the type of communication VRLC has identified as its mass media activity meets the $500.00 threshold for expenditure reporting. VRLC has specified as mass media activity its mailings to its membership and its distribution of literature at local fairs. The State points out that mass media activities are generally understood to be attempts to reach large numbers of the general population, and argues that an internal group mailing or an isolated distribution of flyers at a county fair booth is a far cry from the mass media activities contemplated by the legislature. The State relies on the case of *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 245, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("MCFL"), in which the Court distinguished between mailings of newsletters to memberships and mailings of campaign flyers to a wider audience.

VRLC agrees that it does not publish anonymous advocacy, but it argues that it does publish communications "on behalf of" candidates, under a normal reading of the phrase, to mean "in the interest of." It also argues that it is a strained interpretation of the statute to conclude that the second sentence simply doesn't apply to independent organizations engaged in political advertis-

ing. And it responds that candidate designation requires not only name but address as well. VRLC contends that its membership mailings and its dissemination of pamphlets at county fair booths constitute mass media activities.

Taking the evidence in the light most favorable to VRLC as the nonmoving party, VRLC has made an adequate showing of standing. The plain language of the statutes suggests that the statutes could be applied to VRLC's described activities. Under a literal reading of Sections 2881 and 2882, the disclosure/disclaimer requirements could apply to any of a number of types of communication that implicitly or impliedly advocate for the success or defeat of a candidate and are published in the interest of a candidate, political party or political committee. VRLC's communications advocate for the success of candidates whose views coincide with its own, and publication works to the advantage of like-minded candidates. As to Section 2883, although this Court agrees with the State that membership mailings are not mass media activity, it is entirely likely that distribution of literature at county fairs is an effective way to attempt to reach large numbers of the general population in Vermont.[5]

VRLC has alleged an intention to engage in conduct in apparent violation of the challenged statutes, and produced unrefuted evidence that it has curtailed or refrained from expressive activity in order to comply with the statutes. VRLC has standing to challenge the statutes. *See Arkansas Right to Life State Political Action Comm. v. Butler*, 146 F.3d 558 (8th Cir.1998) (affirming *Arkansas Right to Life State Political Action Comm. v. Butler*, 972 F.Supp. 1187 (W.D.Ark.1997)). *See also Steel Co.*, —— U.S. at ——, 118 S.Ct. at 1010 (District Court has jurisdiction if right to recover will be sustained if Constitution and laws are given one construction and will be defeated if given another). To be sure, the State sharply disagrees with VRLC's interpretation of

---

**5.** Vermont's most thickly settled area is Chittenden County, with a population of approximately 132,000. Attendance figures for the Champlain Valley Fair in Chittenden County for 1997 were 306,600. Telephone Interview with Champlain

Valley Fair official (September 1, 1998). Even allowing for substantial numbers of nonresident attendees, an advocate can expect to reach a large number of a county's residents by distributing literature at a county fair.

the statutes, and protests that it does not consider VRLC's activities to come within the statutes' ambit. The proper construction of the statutes is addressed below.

## III. CONSTITUTIONALITY OF THE STATUTES [6]

■■■ The United States Supreme Court has reminded us in *Buckley v. Valeo* that

[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)).[7] " '[D]ebate on public issues should be uninhibited, robust, and wide-open.' " *Id.,* quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■■■ The identification and notification requirements of Sections 2882 and 2883 constitute compelled disclosure, which "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley,* 424 U.S. at 64, 96 S.Ct. 612. Such an encroachment is subjected to strict or exacting scrutiny, and will be upheld "only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). *See also Federal Election Comm'n v. Hall–Tyner Election Campaign Comm.,* 678 F.2d 416, 421 (2d Cir.1982) (because compelled disclosure can seriously impair right to privacy of association and belief, permissible only upon showing compelling state interest). There must also be a substantial relation between the interest asserted and the information required to be disclosed. *Buckley,* 424 U.S. at 64, 96 S.Ct. 612; *Hall–Tyner,* 678 F.2d at 421.

The United States Supreme Court has recognized three compelling governmental interests which may be served by disclosure requirements: 1) providing the electorate with information about the origin and use of campaign funds; 2) deterring actual corruption and avoiding the appearance of corruption by publicizing large contributions and expenditures; and 3) gathering information necessary to detect violations of contribution limitations. *Buckley,* 424 U.S. at 66–68, 96 S.Ct. 612. The State has argued that all three of these interests are served by the statutes in

---

6. VRLC has chosen to bring its challenge to this state statute in a federal forum. The statute has not yet been construed by the Vermont Supreme Court. Ordinarily federal district courts have an unflagging obligation to adjudicate matters properly within their jurisdiction. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). When a federal court is asked to invalidate a novel state law, however, it risks "friction-generating error" when it attempts to construe the measure. *Arizonans for Official English v. Arizona,* 520 U.S. 43, ——, 117 S.Ct. 1055, 1074, 137 L.Ed.2d 170 (1997) (favoring certification of novel state law issue to state's highest court; acknowledging delay and expense caused by decision to abstain). This Court previously denied the State's motion to dismiss on *Pullman* abstention grounds on January 5, 1998, and will not revisit the issue here. Mindful that federal courts lack competence to rule definitively on the meaning of state legislation, *id.,* 117 S.Ct. at 1059, the Court will nonetheless proceed: the swift approach of an election season counsels against the delay attendant on abstention, and Vermont lacks a procedure for certifying novel state law issues to the state supreme court. Moreover, if a statute can fairly be construed to eliminate the need for the state court construction, there is no reason for the federal court to abstain. *Planned Parenthood Ass'n v. Ashcroft,* 462 U.S. 476, 493 n. 21, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). *See also Bad Frog Brewery, Inc. v. New York State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir.1998).

7. The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment's rights of freedom of speech and assembly are protected against infringement by State government through operation of the Fourteenth Amendment. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

question. VRLC does not dispute the importance of these interests to the State and to the citizens of Vermont, or that these interests may justify disclosure requirements. VRLC argues that the statutes sweep too broadly, to include issue advocacy which receives greater protection under the First Amendment.

In *Buckley,* the Court held that Section 434(e) of the Federal Election Campaign Act which required reporting of independent political expenditures must be narrowly construed to avoid constitutional problems of vagueness and overbreadth "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80, 96 S.Ct. 612. The Court noted that "[t]his construction would restrict the application of [the section] to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' *Id.,* n. 108, referring to n. 52."

The Court reiterated its definition of express advocacy in *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("*MCFL* "): in *Buckley,* "a finding of 'express advocacy' depended upon the use of language *such as* 'vote for,' 'elect,' 'support,' etc." (emphasis supplied). The Court concluded that a message that provided "in effect an explicit directive" to vote for named candidates, which went beyond issue discussion to express electoral advocacy despite a disclaimer of endorsement, represented express advocacy. *Id.* at 249–50, 107 S.Ct. 616. Thus, *MCFL* made clear that a message of express advocacy could be conveyed even in the absence of the specific words the Court used for illustrative purposes in *Buckley.*

The United States Supreme Court pointed out, when it narrowed the federal statute's reach to express advocacy, that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Buckley,* 424 U.S. at 42, 96 S.Ct. 612. *See also id.* at 42, n. 50, 96 S.Ct. 612. For that reason, the Court rejected a construction of the statute which would allow regulation of expenditures relative to candidate advocacy in general, and adopted a bright-line rule limiting the statute's reach to communications containing explicit words of advocacy of election or defeat of a candidate. *Id.* at 42–44, 96 S.Ct. 612. It acknowledged that its "exacting interpretation of the statutory language" left a loophole for ingenious and resourceful persons and groups who by eschewing express terms of advocacy could circumvent the regulation of campaign expenditure, reporting and disclosure requirements, but held it necessary to avoid unconstitutional vagueness. *Id.* at 45, 96 S.Ct. 612. The Supreme Court has not retreated from that position. *See MCFL,* 479 U.S. at 249–50, 107 S.Ct. 616. *See also BAPAC,* 137 F.3d at 506; *Federal Election Comm'n v. Christian Action Network, Inc.,* 110 F.3d 1049, 1051 (4th Cir.1997); *Clifton v. Federal Election Comm'n,* 114 F.3d 1309, 1320 (1st Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *Federal Election Comm'n v. Survival Educ. Fund, Inc.,* 65 F.3d 285, 299 (2d Cir.1995) ("SEFI"); *Faucher v. Federal Election Comm'n,* 928 F.2d 468, 470 (1st Cir.1991); *Federal Election Comm'n v. Furgatch,* 807 F.2d 857, 864 (9th Cir.1987) (express advocacy must be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate); *Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir.1980) ("CLITRIM"); *Right to Life of Dutchess Co., Inc. v. Federal Election Comm'n,* 6 F.Supp.2d 248, 253 (S.D.N.Y. 1998); *North Carolina Right to Life, Inc. v. Bartlett,* 3 F.Supp.2d 675, 678–79 (E.D.N.C. 1998); *West Virginians for Life, Inc. v. Smith,* 960 F.Supp. 1036, 1038–39 (S.D.W.Va. 1996); *Maine Right to Life Comm., Inc. v. Federal Election Comm'n,* 914 F.Supp. 8, 12 (D.Me.), *aff'd per curiam,* 98 F.3d 1 (1st Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997); *Federal Election Comm'n v. National Org. for Women,* 713 F.Supp. 428, 433 (D.D.C.1989).

Statutes that compel disclosure on election-related writings themselves, such as Section 2882 at issue here, arguably are a great-

er intrusion on First Amendment-protected speech than those that impose mandatory reporting requirements. *See McIntyre*, 514 U.S. at 355, 115 S.Ct. 1511 (mandatory reporting is less intrusive than compelled self-identification on all election-related writings). In *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997), however, a panel of the Sixth Circuit Court of Appeals upheld a compelled disclosure requirement for political advertisement containing express advocacy for candidates. Although the compelled disclosure requirement placed a more onerous burden on the plaintiffs than the reporting requirements in *Buckley*, the court concluded that the state's substantial interests in notifying the public of the source of campaign expenditures, along with preventing actual and perceived corruption of the political process, prevailed. *See also Gable v. Patton*, 142 F.3d 940, 945 (6th Cir.1998) (same). And a panel of the Second Circuit Court of Appeals has upheld a requirement that solicitations of contributions for activities that expressly advocate the election or defeat of a clearly identified candidate disclose the identity of the person who authorized and paid for the communication, although it left open the question whether political advertising could be similarly burdened after the Supreme Court's decision in *McIntyre. SEFI*, 65 F.3d at 295–96.[8]

VRLC contends that the statutes in question reach beyond the regulation of express advocacy approved in *Buckley* and cases like *Terry* to burden issue discussion. The State and the Interveners disagree.

**A.** *Disclosure/disclaimer requirements (§§ 2881, 2882)*

 Section 2881 defines a political advertisement as a communication "which expressly or implicitly advocates the success or defeat of a candidate." At issue, therefore, is whether express words of candidate advocacy, or explicit directives to vote for a particular candidate, can include implicit advocacy for the success or defeat of a candidate.

The parties have dueled with dictionary definitions of "implicit" in support of their opposing contentions. Pl.'s Mem. at 8; Defs.' Mem. at 12. The adjective "implicit" has of course two distinct meanings: 1) something capable of being understood although not directly expressed ("implied"); and 2) being without doubt or reservation ("unquestioning"). *Merriam–Webster's Collegiate Dictionary* 583 (10th ed.1997); *The American Heritage Dictionary of the English Language* 660 (William Morris, ed.1969). As the distinguished lexicographer and grammarian H.W. Fowler wrote: "we ask with some indignation whether after all black is white, and perhaps decide that 'implicit' is a shifty word with which we will have no further dealings." H.W. Fowler, *A Dictionary of Modern English Usage* 270–71 (Sir Ernest Gowers ed., 2d ed.1965).

If the Vermont legislature intended to regulate communications that impliedly advocate for or against a candidate, it has flouted the United States Supreme Court's holdings in *Buckley* and *MCFL* which limit disclosure to express candidate advocacy. *See CLITRIM*, 616 F.2d at 53 (to read express advocacy as express or implied advocacy would nullify *Buckley*'s holding). If the Vermont legislature intended to regulate communications that not only expressly but unquestionably advocate for or against a candidate, it is guilty perhaps of redundancy, but not of violating the First Amendment. In light of the ambiguity in Section 2881, legislative intent should be ascertained "through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." *Harris v. Sherman*, 708 A.2d 1348, 1349 (Vt. 1998).

---

**8.** *McIntyre* involved issue advocacy conducted independently of a candidate, political party or committee. The Court struck down a state's prohibition of anonymous campaign literature as an unconstitutional infringement of political speech. 514 U.S. at 357, 115 S.Ct. 1511. *SEFI* distinguished *McIntyre*'s anonymous campaign literature from anonymous solicitation letters, holding that the statute in question served the important purpose of "promoting fair and open electoral competition by informing the public whether ostensibly unaffiliated organizations ... [are] beseeching contributions from the public ... at the behest of candidates." *SEFI*, 65 F.3d at 295.

### B. *Reporting requirements (§ 2883)*

Section 2883 regulates "mass media activities," if the communication includes the name or likeness of a candidate. The section contains no reference to candidate advocacy or political advertisement, other than its inclusion in subchapter 7 of Title 17, which is entitled "Political Advertisements." The State assumes without discussion that Section 2883 applies only to candidate advocacy. Defs.' Mem. at 27 (paper 64). The Interveners argue that it is "highly unlikely" that the statute will regulate "anything other than candidate advocacy." Def.-Interveners' Mem. at 21 (paper 73).

The plain language of the statute requires any person who, within thirty days of an election, spends $500.00 or more on mass communications which contain the name or likeness of a candidate to file reports with the candidate and with the state. Not only is the section on its face not limited to express candidate advocacy, it is not limited to candidate advocacy in general. Any commercial advertiser, for example, who chose to link a product or an event with an individual who happened to be running for office could be subject to the statute's requirements. Section 2883, like the measure at issue in *Buckley,* has the potential to encompass both issue discussion and candidate advocacy.

### C. *Sections 2881–2883 construed*

 The Vermont legislature enacted the reporting and disclosure requirements to ensure corruption-free statewide and state legislative election campaigns, to inform the public, and to assist in enforcement of contribution limits. Act 64, Sec. 1(a), (b). Like the United States Supreme Court in *Buckley,* this Court's task is to construe the statutes, if it can, to further these goals. The Vermont General Assembly is presumed to have knowledge that the *Buckley* decision limited campaign expenditure reporting and disclosure requirements to apply only to express candidate advocacy. *See State v. Read,* 680 A.2d 944, 947 (Vt.1996) (legislature presumed to enact statute with knowledge of relevant judicial precedents and prior legislation on

subject). This Court is obliged to construe statutes to avoid constitutional problems whenever possible. *Federal Election Comm'n v. Political Contributions Data, Inc.,* 943 F.2d 190, 191 (2d Cir.1991). If a state statute is readily susceptible to a narrowing construction that would render it constitutional, it will be upheld against a facial challenge. *American Booksellers,* 484 U.S. at 397, 108 S.Ct. 636. *See also Boos v. Barry,* 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Virginia Soc. for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 270 (4th Cir.1998).

The statutes are susceptible to a narrow construction, as urged by the State and the Interveners, which is reasonable, avoids the constitutional question, and is consistent with the United States Supreme Court's construction in *Buckley.* In accordance with *Buckley,* then, Section 2881's definition of "political advertisement"—communication that "expressly or implicitly advocates the success or defeat of a candidate,"—is hereby limited to communication that in express terms advocates the election or defeat of a clearly identified candidate.[9] Section 2882's identification and disclosure requirements therefore apply only to communications which expressly advocate the election or defeat of a clearly identified candidate.

 To avoid constitutional overbreadth, "expenditure" as used in Section 2883 must be construed "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley,* 424 U.S. at 80, 96 S.Ct. 612. This construction is reasonable, because it is consistent with *Buckley*'s construction of "expenditure" in a similar context. This reading of the statute means that only spending which is "unambiguously related to the campaign of a particular ... candidate" must be reported under Section 2883. *Id.* This limitation ensures that the information which must be provided has a substantial connection with the state's interests in informing the public about campaign expen-

---

**9.** To the extent that any interpretation of the word "success" other than to mean "election" in the context of this statute is possible, the word is construed to mean "election."

ditures and in enforcing campaign contribution limits.

The statutes as narrowed still burden the First Amendment, but are narrowly tailored to further compelling state objectives. *See id.,* at 68, 96 S.Ct. 612 (disclosure requirements appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption); *Kimbell v. Hooper,* 164 Vt. 80, 87, 665 A.2d 44, 49 (1995) (same, quoting *Buckley* ). The statutes as narrowed may allow some issue advertisement expenditures to go unreported, but the statutes' ability to effectuate the legislature's compelling purpose of informing the public of the sources of candidates' financial support remains largely intact. Moreover, "grim efforts" to regulate every aspect of campaign finance "will inevitably trench unacceptably far upon current conceptions of freedom of political speech." Kathleen M. Sullivan, *Political Money and Freedom of Speech,* 30 U.C. Davis L.Rev. 663, 688 (1997).

## CONCLUSION

It is not seriously disputed that evasion of campaign contribution regulation through "soft-money" spending on "issue ads" has occurred, and that it contributes to public cynicism about the integrity of the electoral system. *See* Anthony Corrado, *Party Soft Money, in Campaign Finance Reform* 167, 176–77 (Anthony Corrado et al. eds., 1997); Elizabeth Drew, *Get Ready for the 'Issue Ads,'* Washington Post, March 17, 1998, at A21; Ruth Marcus, *RNC Steered Funds to Outside Groups,* Washington Post, October 23, 1997, at A1; Jill Abramson & Leslie Wayne, *Democrats Used the State Parties to Bypass Limits,* New York Times, October 2, 1997, at A1. The Defendant–Interveners have submitted affidavits attesting to Vermonters' concerns about the integrity of the electoral system and their desire for information about who pays for political advertising in order to be better informed concerning state and local election campaigns. *See* Decl.'s of Pollina, Thompson, Schuyler (paper 74).

The ability to acquire and to share information and points of view—the essence of freedom of speech—is indispensable to effective participation in the electoral process.

Reporting and disclosure requirements in particular promote First Amendment values in addition to promoting electoral integrity. Ultimately, however, the First Amendment's guarantees have the very democratic effect of placing the power to determine what views shall be voiced not into the hands of the government, but "into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Vermont has a crucial interest in curbing the excesses of soft money spending. Today's ruling seeks to give force to the equally weighty First Amendment principles on both sides of the controversy: disclosure to the public of information bearing on the source of funds for political advertising; and dissemination of information concerning candidates and their positions free of undue governmental interference.

Neither the voter guides nor any other VRLC-sponsored document submitted to the Court expressly call for a candidate's election or defeat, as the parties concede. "Political advertisement" having been narrowly construed, Section 2882's identification and disclosure requirements apply only to communications which expressly advocate the election or defeat of a clearly identified candidate. "Expenditure" having been similarly construed, Section 2883 applies only to spending used for qualifying mass media activities that expressly advocate the election or defeat of a clearly identified candidate. Sections 2881–2883 do not apply to the communications of individuals or groups that engage solely in issue advocacy. Sections 2881, 2882 and 2883 as construed do not apply to any of VRLC's publications. VRLC's motion for summary judgment on counts one through four is therefore denied; the State's motion for summary judgment on counts one through four is granted, and the Defendant–Interveners' motion for summary judgment is denied as moot.

## ORDER

For the reasons stated above, Plaintiff's Motion for Summary Judgment (paper 49) is DENIED. Defendants' Motion for Summary Judgment (paper 65) is GRANTED. Defendant–Interveners' Motion for Summary Judgment (paper 69) is DENIED as moot. Count 5 having been previously dismissed, the case is now CLOSED.