**FEDERAL ELECTION COMMISSION,**
Plaintiff,

v.

**PUBLIC CITIZEN, INC.,**
et al., Defendants.

No. CIV.A.1:97CV358RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 15, 1999.

Lawrence M. Noble, phv, Richard B. Bader, phv, Stephen E. Hershkowitz, phv, Colleen T. Sealander, phv, Federal Election Commission, Washington, DC, for plaintiff.

Kenneth S. Canfield, Doffermyre, Shields, Canfield, Knowles & Devine, Atlanta, GA, Cornish F. Hitchcock, phv, David C. Vladeck, phv, Public Citizen Litigation Group, Washington, DC, for defendants.

## ORDER

STORY, District Judge.

This case is before the Court for consideration of Plaintiff's Motion for Summary Judgment [23–1] and Defendants' Motion for Summary Judgment [22–1]. After considering the entire record, the Court enters the following Order.

### FACTUAL BACKGROUND [1]

Public Citizen, Inc. ("Public Citizen") is a national consumer advocacy organization that was founded in 1971 and is chartered as a membership organization under the laws of the District of Columbia. (Def.Ex. 1, ¶ 3.) Public Citizen has approximately 130,000 members nationwide; members pay annual dues of $20.00. (Def.Ex. 1, ¶ 3.) Membership is voluntary, and there are no reprisals Public Citizen can threaten if members choose not to give money. (Def. Ex. 1, ¶¶ 8 and 9.) Public Citizen was

established for educational and charitable purposes and is recognized as a charitable entity under section 501(c)(4) of the Internal Revenue Code. (Def. Ex. 1, ¶¶ 3 and 4.) Public Citizen has no shareholders or other persons with a claim on its assets. (Def.Ex. 1, ¶ 4.) It was not set up by a corporation or union and has not accepted money from either type of entity. (Def.Ex. 1, ¶ 4.)

For over a decade, a key focus of Public Citizen's efforts has been the reform of campaign finance laws—with an emphasis on expanding the availability of public funding for federal elections, tightening the rules governing congressional salaries and perks and curbing the flow of corporate-sponsored contributions and other emoluments to members of Congress and candidates. (Def. Ex. 1 ¶ 5; Def. Ex. 2, ¶ 5.) In November, 1991, in an effort to break the congressional logjam on campaign finance reform legislation, Public Citizen's Board of Directors authorized creating a "separate segregated fund" (the "Fund") consistent with the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431–455, and Federal Election Commission ("FEC") regulations. (Ex. 2 to McDonald Dep.) The Public Citizen board authorized the creation of the Fund to raise voluntary contributions from Public Citizen members and to use those donations to make independent expenditures on a strictly bi-partisan basis against a small group of incumbents. (McDonald Dep. at 32–33 and Ex. 2 thereto.) It was anticipated that the targeted candidates would be those members of Congress who had played a significant role in blocking campaign finance reform efforts in Congress. (Def. Ex. 2, ¶ 5; McDonald Dep. at 19.)

In April, 1992, the Board of Directors formally ratified the establishment of the Fund and authorized the appointment of Craig L. McDonald ("McDonald") as its Treasurer. (Ex. 2 to McDonald Dep.) The

---

1. The factual background is taken from the Statement of Material Facts Not in Dispute submitted by both of the parties.

Fund sought to pay for its activities by sending two solicitation letters to Public Citizen members. (Complaint, Attachments 1, 7.)

The first letter was sent on or about May 18, 1992. (McDonald Dep. at 47.) This solicitation letter explains the goals of the Fund and urges people to donate money to the "Vote 'Em Out!" campaign. (Complaint, Attachment 1.) The letter did not identify specific candidates, but explains: "Using this fund, Public Citizen will designate the worst abusers—the five politicians who take full advantage of the current corrupt political system and unashamedly block reform—and will inform voters of why they should be defeated." (Complaint, Attachment 1, p. 1.) The letter adds: "After the primaries, the money from the 'Vote 'Em Out!' fund will be used to alert citizens about why they should vote out these politicians," and this campaign "will use everything—T.V., radio, door-to-door canvassing—to let their constituents know what their members of Congress have been up to for the past few years" on issues such as a recent congressional pay raise, free vacations from lobbyist groups, bounced checks on the House Bank and their use of congressional "perks." (Complaint, Attachment 1, pp. 2–3 (emphasis omitted).)

Included with the letter was a return card for Public Citizen members wishing to make a donation. It read in relevant part:

> Enclosed please find my contribution in the amount of:
>
> _____$20          _____$50
>
> _____$40          _____OTHER

(Complaint, Attachment 1, p. 6.)

The second solicitation letter, mailed to 6,000 members in October, 1992, solicited money to use against nine named House members, both Republican and Democratic, who were seeking re-election and were described as "House members who have not only taken advantage of our current campaign finance system, but who have also fought against reforms." (Complaint, Attachment 7, p. 1.) A brochure attached to the letter identified by name the incumbents who were being targeted and explained that they were "targeted for the same reasons we went after Gingrich." (Complaint, Attachment 7, pp. 2, 4.) Among the factors listed were their perceived vulnerability and the fact that the "media markets in their districts are affordable." (Complaint, Attachment 7, p. 2.)

The Fund raised about $162,400.00 from these two letters, which cost a total of $52,000.00 to print and mail. (Jt. Ex. A at 6, paras 6, 7.a.) The 1992 election was the only one in which the Fund was ever active. Public Citizen tried to close it down after the 1992 election but the FEC refused to let the Fund go out of business while the investigation and now this suit are pending. (Def.Ex. 5.)

The Fund decided to enter the Republican primary race in Georgia's Sixth Congressional District early in July, 1992, less than three weeks before the primary. (McDonald Dep. at 55–56.) This decision was made after the Fund had raised necessary funds for an expenditure from its May, 1992 solicitation. (McDonald Dep. at 56; Def. Ex. 2, ¶ 15.)

Upon making the decision to enter the race, McDonald authorized the media consulting firm of Zimmerman and Markman based in Santa Monica, California to prepare a television advertisement that could be used in the Gingrich race and later on, in other races. (McDonald Dep. at 103–116; Def. Ex. 3, ¶¶ 7, 9; Jt. Ex. A at 19–20.) McDonald had previously contacted Mr. Zimmerman about the possibility of preparing such an ad, assuming that the fund decided to target this race and was able to raise enough money. (Def Ex. 3, ¶¶ 4–6.) Defendants contend Mr. Zimmerman was entirely responsible for developing the contents of the ad and producing it. (Def.Ex. 3, ¶¶ 11–13.) However, in his deposition, McDonald testified that he participated in development of the ad. (McDonald Dep. at 103–116.) Mr. Zimmer-

man had no contact with the campaign of Herman Clark ("Clark"), Representative Gingrich's opponent, nor was he aware of any themes being used by the Clark campaign. (Def.Ex. 3, ¶¶ 12–13.)

The Fund announced its "Boot Newt" campaign and unveiled its television advertisement at an Atlanta press conference on July 8, 1992. (McDonald Dep. at 116, Ex. 9–10.) The visual component of the advertisement was a cash register that rang each time the announcer made a point critical of Representative Gingrich. The announcer said:

> [Visual: Cash register with the name "Newt Gingrich" rung up.] Newt Gingrich just doesn't practice what he preaches. He said he was against pay raises. [Visual: "$35,000" is rung up on a cash register]. But he voted this raise for himself. He says he's against congressional perks. [Visual: "$67,000" is rung up]. But he stuck us with a chauffeured limousine. [Visual: "$178,000" is rung up]. And spent more on free mail than any Georgia Congressman. [Visual: "1,400,000" is rung up.] And he took more from special interests than any Georgia Congressman. [Visual: the name "Newt Gingrich" is rung up.] Newt Gingrich is just a sell out. So on July 21st, tell him ... [Visual: "NO SALE" is rung up]. [Visual: "Paid for by Public Citizen's Fund for a Clean Congress."] [Visual: "July 21. BOOT NEWT."]

(Ex. 7 to McDonald Dep.)

The "Boot Newt" television advertisement did not state whether or not it was authorized by any candidate or candidate committee. (Ex. 7 to McDonald Dep.) The Fund spent $48,000.00 to produce and air this advertisement, which ran on Atlanta television between July 10 and 20. (Ex. 16 to McDonald Dep. at 4, ¶ 1.b.)

I.J. (Jim) Lovejoy, III ("Lovejoy") did not like the "Boot Newt" theme because it was not specific enough to remind voters of Gingrich's bounced checks, which was the theme of the Clark campaign's "Bounce Newt" slogan and advertising.

(Lovejoy Dep. at 114.) The Clark campaign was not aware of the content of Public Citizen's advertisement before it began airing on Atlanta television. (Lovejoy Dep. at 205; Def. Ex. 4, ¶ 11.) The Clark campaign was concerned about any public association with the Fund's involvement in the race for two reasons. First, Public Citizen was founded by Ralph Nader, and Lovejoy was concerned that the politically conservative voters in the Republican primary might well vote for Rep. Gingrich if it was perceived that a "Ralph Nader group" was actively campaigning against Rep. Gingrich. (Lovejoy Dep. At 160–61.) Clark shared that opinion and did not want to be viewed as the "Ralph Nader candidate" in the Republican primary. (Def.Ex. 4, ¶¶ 14, 16.) Second, the Clark campaign was concerned that the Fund's activity threatened to unleash independent expenditures in support of Rep. Gingrich from groups affiliated with the American Medical Association. Specifically, Lovejoy stated that he "was very much afraid that Public Citizen's independent expenditure would literally get blown away by an AMA expenditure." (Lovejoy Dep. at 161.) These views were also shared by Clark. (Def.Ex. 4, ¶ 15.)

The Fund also distributed on or about July 17, 1992 a postcard to some 6,000 Democratic voters urging them to "Boot Newt" in the upcoming Republican primary. (Complaint, ¶ 30 and Attachment 2.) At a candidate debate on July 18, 1992, the Fund also distributed some 200 flyers urging the defeat of Representative Gingrich. (Complaint, Attachments 3–6.) The cost of these flyers which were produced on a word processor was nominal. (Ex. 16 to McDonald Dep. at 4–5, ¶ 2.b.) The flyers included a statement: "Paid for by Public Citizen's Fund For a Clean Congress, Craig McDonald, Treasurer." (Complaint, Attachments 3–6.)

The Fund reported its expenditures on the advertisement, the postcard mailings, and other items to the FEC as independent expenditures. (Def.Ex. 2, ¶ 18.) The

Fund filed with the FEC a form disclosing the identities of all individuals who donated money to the Fund above the threshold specified in the FECA. (Def.Ex. 2, ¶ 18.) The Fund also reported, in accordance with FEC regulations, its independent expenditures in the Sixth District race with the Clerk of the House of Representatives and the Georgia Secretary of State. (Def. Ex. 2, ¶ 18; Ex. C to Jt. Ex. C.) The first expenditure reported was for $48,000, which was the money spent producing the Fund's television advertisement and buying media time. The second expenditure reported was for $2843.17 for McDonald's time and that of William Parsons, his assistant. The third expenditure reported was for the Fund's postcard mailing, which cost $1140 for postage and $330 for printing, for a total of $1470. (*Id.*)

In April, 1992, before the Fund had begun raising any funds and before it knew whether it would ever be able to spend any money, McDonald sought to obtain information on the Georgia Sixth District race from Frank Jackalone ("Jackalone"), a friend who lived in Atlanta and who did consulting work for Public Citizen. (McDonald Dep. at 61; Jackalone Dep. at 10–14, 40, 55.) Jackalone was not an employee of Public Citizen or the Fund, and McDonald had no supervisory authority over him. (McDonald Dep. at 57–58, 72–73.)

McDonald was preliminarily interested in the Georgia Sixth District Republican primary because there was no incumbent and because Representative Gingrich, who was running in that district for the first time, was an influential House member in his capacity as minority whip and because he had been an outspoken opponent of campaign finance reform and opposed Public Citizen's position on other issues. (McDonald Dep. at 54; Def. Ex. 2, ¶ 3.) The first person to declare his candidacy for the Sixth District Congressional seat was State Representative Herman Clark ("Clark") whose district was based in west Cobb County and who resigned from the Georgia House in November, 1991 to make the race for Congress (Def. Ex. 4 ¶ 2.)

Another candidate declared himself a candidate for the seat, but later dropped out after a conversation with Representative Gingrich and decided to run for a seat in the Georgia House of Representatives instead. (Jackalone Dep. at 55–56; Def. Ex. 4 ¶ 9.)

In April, 1992, McDonald was interested in having Jackalone obtain a copy of the Clark campaign's press kit. (McDonald Dep. at 65.) McDonald anticipated that the press kit would be a general packet of materials that is sent out to the media that would better inform his judgment as to whether this was going to be a close race. (McDonald Dep. at 65.) Jackalone confirmed that he was asked to "find out if they had a basic kit that they were releasing to the media which gave information about the candidate, the basic bio and any other information they were supplying in that kit." (Jackalone Dep. at 55.) The press kit obtained by Jackalone and sent to McDonald contained press clippings and other items in the public domain, and included a copy of the Clark Campaign's budget. (Ex. 5 to McDonald Dep.; Lovejoy Dep. at 116.) McDonald hoped that the press kit would set out Clark's "position on campaign finance reform because that was the issue they [the Fund] were going to utilize in their negative pieces on Gingrich and they wanted—we didn't want to be in a situation where the media would say, why are you going after Gingrich when his opponent has the same position." (Jackalone Dep. at 55.)

McDonald was also interested in Jackalone's assessment, as an Atlanta-based consultant who was familiar with the local political scene, whether Clark was a "serious candidate." (McDonald Dep. at 65.) It was important to McDonald that Clark would not withdraw from the race. Clark was "Mr. Gingrich's opponent and we wanted the opponent to win, whether the opponent was Genghis Khan, whoever it was. So, yes, the seriousness of the opponent's campaign was important to me, yes, in making the decision." (McDonald Dep.

at 84.) When asked whether the seriousness of the Clark campaign was a decisive factor in determining whether to expend funds to defeat Representative Gingrich, McDonald replied that "it was a sine qua non of the campaign. Had there not been an opponent, it would have been irrational to spend a dime. Yes, is important. Did it matter who it was, no." (*Id.*)

When McDonald asked Jackalone to obtain information for him about Clark, he never expected that he would receive any confidential information from the Clark campaign. (Def.Ex. 2, ¶ 7.) After making some initial inquiries, Jackalone called the Clark campaign in April, 1992 to obtain the press kit, and he had a five to ten minute telephone conversation with Lovejoy, Clark's campaign manager. (Jackalone Dep. at 55–56.) Specifically, Jackalone, "gave him [Lovejoy] a call, told him who I was, why I was calling," and "[r]equested the packet, which he sent me, and I forwarded to Washington" after making a copy for himself. (Jackalone Dep. at 56.) Jackalone also asked Clark's views on campaign finance reform and received a "positive" response. (Jackalone Dep. at 59.) According to Lovejoy, Jackalone stated that Public Citizen was "considering making an independent expenditure in the Clark/Gingrich campaign," and Lovejoy scheduled a meeting with Jackalone. Lovejoy stated he later crossed the meeting off his calendar because Jackalone was unable to provide Lovejoy with a legal opinion stating that it would be permissible for the two of them to meet. (Lovejoy Dep. at 183–186.) Jackalone is "absolutely certain" that he did not request a meeting with Lovejoy. (Jackalone Dep. at 90.)

When Jackalone called to speak with Lovejoy:

> another concern that Public Citizen had was whether Herman Clark was going to drop out, whether there was actually going to be a race. So I was asked to see, is there actually going to be a race, is this candidate [Clark]—is he going to continue to run or is he planning to withdraw as well .... I identified Jim Lovejoy, gave him a call, told him who I

was, why I was calling ... I asked whether Clark was intending to stick it out through the primary. He said yes. I relayed that information to Craig McDonald.

(Jackalone Dep. at 56.) Generally, Jackalone sought information about whether Clark was going to be a serious candidate. (Jackalone Dep. at 88.)

Jackalone and Lovejoy did not discuss Rep. Gingrich or his position on campaign finance. (Jackalone Dep. at 83.) Jackalone stated that he and Lovejoy did not discuss Rep. Gingrich's limousine, any advertisements, prior Gingrich campaigns, any campaign slogans, the 1989 Congressional pay raise, or Clark's fund raising efforts. (Jackalone Dep. at 86, 88, 90, 100–101.)

Based on the communication, McDonald felt assured that Clark was going to stay in the race, i.e., Clark "wasn't going to withdraw as the other Republican had done." (Jackalone Dep. at 58–59; 89, 104.) When Jackalone reported the results of this conversation to McDonald, stating that Clark "was going to stick in the race," McDonald responded, "Good. We will wait to get the information that they send us. Send it up to me." (Jackalone Dep. at 104.) Clark's reassurance about his commitment to the race was "important" (McDonald Dep. at 84) to McDonald in deciding whether to expend funds to oppose Rep. Gingrich in the primary, and the Fund would "absolutely not" have entered the primary if Clark might not have stayed in the race. (McDonald Dep. at 83.)

McDonald was concerned about the propriety of direct contacts between Public Citizen and the Clark campaign and he used Jackalone as an intermediary to create a "fire wall so that no one ever accused me [McDonald] of coordination with the Clark campaign." (McDonald Dep. at 82.)

Clark was asked on numerous occasions from 1991 on whether he intended to stay in the race, particularly after Rep. Gingrich decided to move into the Sixth District

and run there. (Def. Ex. 4 ¶ 9.) Anything Lovejoy may have said to Jackalone about Clark being in the race to stay simply repeated something the Clark campaign had said and would say to anyone. (Def.Ex. 4, ¶ 9.) All information disclosed to Jackalone in that initial phone call with Lovejoy was information that the Clark campaign was "willing to disclose to the world." (Def.Ex. 4, ¶¶ 10,19.) McDonald understood that all · information that he received as a result of that conversation between Jackalone and Lovejoy was in the public domain. (Def.Ex. 2, ¶ 9.) McDonald did not place much value on any statement from Lovejoy that Clark planned to stay in the race because candidates will usually say "Yes" if asked if they intend to stay in a race. In addition, the primary was more than three months away, and the Fund had not raised any money. (Def.Ex. 2, ¶¶ 11, 14.)

McDonald was more persuaded by the press kit than any representation that Clark was a serious candidate, in that the clippings and other publically available information in that kit indicated that Clark was an experienced office holder who was running a serious campaign. (Def.Ex. 2, ¶ 12.) By the time the Fund decided to enter the Sixth District race with an independent expenditure, it was obvious that Clark was an aggressive campaigner who intended to remain in the race. (Def.Ex. 2, ¶¶ 15–16.)

Jackalone continued to communicate with the Clark campaign. Lovejoy informed Jackalone about several allegations about Rep. Gingrich's activities. Lovejoy contacted Jackalone to draw the Fund's attention to questions about Rep. Gingrich's role in GOPAC, a political committee Rep. Gingrich chaired. Lovejoy "went on for about ten minutes about GOPAC" and "recommend[ed] that Public Citizen go through Nexis" to learn more. (Jackalone Dep. at 144.) Lovejoy was "really hot on getting this [information about GOPAC] out to Jackalone, and he faxed Jackalone GOPAC materials on three occasions". (*Id.* at 49, 141–42, 148, Ex. 11.) Although these materials were sent unsolicited

(Jackalone Dep. at 141), Jackalone stated there "might have been once or twice that" he agreed to accept these materials. (*Id.* at 49–50.) Jackalone also briefed McDonald on the GOPAC allegations, stating that:

I think I summarized for him what my impression of what GOPAC was, and that apparently there was something about— something to do with contributors to GOPAC that was involved and there was something that might implicate Newt in some way and then he said, "I will check back with you," but I did not go into the specific details of what was in these materials or what Lovejoy had told me.

(*Id.* at 147.)

McDonald recalls being informed about these communications. (McDonald Dep. at 134–135.) McDonald said that they might look into it after the election, but he was "very, very emphatic" in telling Jackalone that the information could not be used before the election. (Jackalone Dep. at 145.) Jackalone and Lovejoy also discussed other allegations the Clark campaign was using as campaign issues, including allegations about Rep. Gingrich's bounced checks and use of chauffeured limousines. (Lovejoy Dep. at 68–70, 101–104; Jackalone Dep. at 87.) Lovejoy also gave Jackalone information about an alleged photograph of Rep. Gingrich in a gay bar and suggested the Fund should "check this out:"

He said, "You might want to check this out." ... [H]e said there are good sources saying that this picture exists of Newt at a gay bar and that Barney Frank has it, has a copy, and it sounded a little ridiculous but I took the information. I said, "All right. Okay." He was calling me to say, you guys really ought to check on this. I did not pursue it ... [H]e was leaking it to me because I was associated with Public Citizen and because I had called him initially.

(Jackalone Dep. at 151–53.) Jackalone passed this information on to McDonald

who acknowledged that "Jackalone mention[ed] something about that to me in a telephone conversation, saying that he had heard that such a picture exists . . . ." (McDonald Dep. at 169.)

On May 29, 1992, the Clark campaign released some favorable polling data, which was transmitted "to the world," according to Lovejoy. (Lovejoy Dep. at 169.) Jackalone testified that Lovejoy called him and offered him a summary of the data, which summary was faxed to him at some point either before or after the call, although Jackalone could not recall the precise chronology. (Jackalone Dep. at 110–11.) According to Jackalone, Lovejoy said it had not yet gone to press (Jackalone Dep. at 112) although Lovejoy recalled that the call—that he said Jackalone initiated after the story appeared in the media (Lovejoy Dep. at 176)—was made after the public release on May 29. (Lovejoy Dep. at 175.) Regardless of the discrepancies, Jackalone's action upon receipt of the polling summary was to call McDonald in Washington, who told him that the Fund could not use the data, and Jackalone did nothing further with it. (Jackalone Dep. at 113.)

Jackalone also called Lovejoy to solicit his help in identifying an appropriate "mailing service" for the Fund to use. Lovejoy provided Jackalone with one or two names, and Jackalone "passed [them] along to Craig McDonald." (Jackalone Dep. at 81.)

Representative Gingrich defeated Clark in the July, 1992 primary by 980 votes. (M. Barone, G. Ujifusa, *The Almanac of American Politics* 1994, 348 (1993).) A day or two after the primary, Jackalone called Lovejoy to discuss certain irregularities at the polls, although nothing further happened on that issue. (Jackalone Dep. at 159–60.) In August, 1992, Lovejoy and Jackalone had lunch in Marietta at which time Lovejoy asked about the prospect of his coming to work for Public Citizen and mentioned his interest in working further on Rep. Gingrich's involvement with GOPAC. Nothing further happened, and Lovejoy was not considered for a position. (Jackalone Dep. at 157–58.)

The National Republican Congressional Committee filed a complaint with the FEC shortly after the Sixth District primary, alleging that the Fund and other groups had engaged in unlawful coordination. (Jt.Ex. C.) While the FEC was investigating the Fund, the FEC was also conducting a parallel investigation of the Clark campaign, which ended in December, 1996 with the Clark campaign agreeing to pay a $5,000 fine. (Jt.Ex. D.) In that settlement, the Clark campaign did not contest the FEC's version of events or the FEC's conclusion that these events constituted unlawful coordination under FECA. (Jt.Ex. D, ¶¶ 6–9.) According to Clark, once he had lost the primary and then spent four years embroiled in an FEC investigation, he did not have the resources to engage in protracted litigation with the FEC and wanted to put the matter behind him. (Def.Ex. 4, ¶¶ 18–19.) Clark understood that his campaign did not provide anything to the Fund that was not publically available. (Def.Ex. 4, ¶ 16.)

## DISCUSSION

In Count One of the Complaint, the FEC alleges that the expenditures by Public Citizen were not independent expenditures but were coordinated expenditures which are not permitted to exceed $1,000. 2 U.S.C. § 441a(a)(1)(A). The FEC relies upon the various communications between Jackalone and Lovejoy to support its allegation of coordination.

FECA defines "independent expenditure" as follows:

The term "independent expenditure" means an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate, or any authorized committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of,

any candidate, or any authorized committee or agent of such candidate.

2 U.S.C. § 431(17).

FEC regulations further define an "independent expenditure" as one that is "not made with the cooperation or prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of the candidate." 11 C.F.R. § 109.1(a). The rule also adds the following presumption:

An expenditure will be presumed to be so made when it is based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents with a view toward having an expenditure made.

11 C.F.R. § 109.1(b)(4)(i)(A).

■ Even construed most favorably for the FEC, the evidence in this case does not support a conclusion that the expenditures by Public Citizen were coordinated with the Clark campaign. Coordination, in the context of this analysis, implies "some measure of collaboration beyond a mere inquiry as to the position taken by a candidate on an issue." *Clifton v. Federal Election Comm.*, 114 F.3d 1309, 1311 (1st Cir. 1997), citing *Buckley v. Valeo*, 424 U.S. 1, 46–47 and n. 53 96 S.Ct. 612, 647–48 and n. 53 46 L.Ed.2d 659 (1976).

The communications between Jackalone and Lovejoy are those on which the FEC relies. The initial conversation was prompted by McDonald's request that Jackalone inquire as to Clark's likelihood of remaining in the race through the election and Clark's stand on campaign finance issues. Providing information of this kind does not rise to the level of consultation or coordination between the parties. As McDonald explained, it would have been absurd for Public Citizen to expend funds in a campaign to defeat Rep. Gingrich if there were no candidate opposing him. Likewise, it would have been absurd to oppose Rep. Gingrich if his only opponent shared Rep. Gingrich's views on the only issue of interest to Public Citizen in the race.

Nor did any of the subsequent communications between Jackalone and Lovejoy constitute coordination. Lovejoy passed on to Jackalone information about the campaign that was being disseminated to the public. The Clark campaign took no part in creating the ad or other materials by Public Citizen. The Clark campaign had no part in deciding when Public Citizen would publish its campaign materials.

The FEC contends that efforts by Public Citizen and the Clark campaign to avoid the appearance of coordination is evidence of their knowledge of their wrongdoing. McDonald sought to insulate himself from contact with the Clark campaign by having Jackalone make contact with Lovejoy. McDonald also declined to use any of the information which Lovejoy volunteered to Jackalone subsequent to the initial contact. Rather than being efforts to hide wrongdoing, these appear to be good faith efforts on the part of McDonald to avoid coordination with the Clark campaign. The Court recognizes the FEC must be vigilant to identify those who would circumvent the elections laws by using intermediaries; however, the Court finds such a characterization of the facts in this case to be unfair.

The record in the case does not support a conclusion that expenditures by Public Citizen were coordinated with the Clark campaign. On the contrary, the evidence demands a conclusion that these expenditures were "independent expenditures." Therefore, Defendants are entitled to summary judgment as to Count One of the Complaint.

Count Two of the Complaint alleges Defendants violated FECA by failing to report the alleged coordinated expenditures as contributions to the Friends of Herman Clark for Congress Committee. However, the Court, having found that the expenditures were independent expenditures, finds Defendants are entitled to summary judgment as to Count Two.

Counts Three and Four of the Complaint allege Public Citizen failed to include the disclaimer required by 2 U.S.C.

§ 441d(a) in the "Boot Newt" television advertisement and in the "Boot Newt" flyers. The relevant portion of 2 U.S.C. § 441d(a) provides:

> Whenever any person makes an expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, ... such communication ... (3) if not authorized by a candidate, an authorized committee of a candidate, or its agents, shall clearly state the name of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

The FEC's allegation is that the television advertisement and postcards produced by Defendants did not contain disclaimers stating whether or not the communication was authorized by any candidate or candidate's committee. Defendants admit that this disclaimer was not included. However, Defendants contend that statements on the ad and flyers that they were "Paid for by Public Citizens Fund for a Clean Congress, Craig McDonald, Treasurer" substantially complied with the requirements of 2 U.S.C. § 441d(a). Defendants contend that the requirement of any further disclaimer imposes an unnecessary and invalid burden on Defendants' First Amendment rights.

> Two Supreme Court cases, *Buckley* and *McIntyre v. Ohio Elections Comm.*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed. 426 (1995), provide the parameters for our analysis of this issue.

> In *Buckley*, the seminal decision on campaign regulation, the plaintiffs brought First Amendment challenges to various provisions of the Federal Elections Campaign Act of 1971. These provisions required federal campaign contributors to report their direct candidate contributions, as well as any independent expenditures to the Federal Election Commission. *Buckley*, 424 U.S. at 63–64, 96 S.Ct. at 656. Using a strict scrutiny analysis, the Supreme Court permitted these restrictions upon plaintiffs' First Amendment rights because they were narrowly tailored to directly serve three substantial governmental interests: 1) notifying the public of the source of campaign funds; 2) preventing actual and perceived corruption in the political process; and 3) creating a recordkeeping method to detect violations of the Campaign Act's contribution limitations. *Id.* at 64–68, 96 S.Ct. at 656–58. The Court balanced these interests against the free exercise of First Amendment rights and concluded that the reporting requirements were constitutional because they were narrowly tailored to further these interests. The Court's approach in *Buckley* provides the constitutional framework for analyzing First Amendment challenges to campaign contribution regulations.

At the other end of the spectrum is the more recent case of *McIntyre*, which addressed the specific issue of the constitutionality of mandatory identification disclaimers. At issue in *McIntyre* was an Ohio ordinance requiring mandatory identification disclaimers on issue advocacy expenditures. *Id.* at 336–37, 115 S.Ct. at 1514. The Court noted that the mandatory reporting requirements upheld in *Buckley* while certainly an intrusion on First Amendment rights, revealed far less information than the mandatory identification disclaimers *sub judice* at *Id.* at 354–55, 115 S.Ct. at 1523. Furthermore, in contrast to the independent expenditure regulations addressed in *Buckley*, the *McIntyre* court found that the public's concern with preventing corruption was greatly diminished in the context of issue advocacy expenditures. *Id.* at 354–58, 115 S.Ct. at 1523–24. Based upon these factors, the Court struck down the ordinance. Of particular relevance to this case, the *McIntyre* majority highlighted the significant possibility of corruption commensurate with independent expenditures and recognized that the potential for corruption associated with issue advocacy expenditures is significantly low-

er because issue advocacy expenditures do not directly support political candidates. *Id.* Accordingly, the government's interest in limiting political corruption is stronger when independent expenditures, as opposed to issue advocacy expenditures, are regulated.

The challenges presented in *Buckley* and *McIntyre* can best be characterized as two points on a continuum, with plaintiffs' challenge falling somewhere between them. *Buckley* balanced substantial government interests in combating corruption in the political process against the First Amendment infringement of reporting requirements and concluded that those interests outweighed the limited infringement. *McIntyre* then applied the reasoning of *Buckley* and concluded that the additional First Amendment burdens exacted by requiring identification disclaimers on issue advocacy expenditures outweighed the state's more limited interest in identifying the proponents of issue advocacy. Like *Buckley,* Kentucky's substantial interest in notifying the public of the source of campaign expenditures, along with preventing actual and perceived corruption in the political process, are clearly implicated. Like *McIntyre,* the disclaimer provision at issue in this case places a more onerous burden on [Defendants] than the report requirements analyzed in *Buckley.*

The identification disclaimer requirement in § 121.190(1) clearly implicates First Amendment protection because it burdens core political speech. *McIntyre,* 514 U.S. at 344–48, 115 S.Ct. at 1518–19. When a statute burdens First Amendment rights, it must be "narrowly tailored to serve an overriding state interest." *Id.* at 347–48, 115 S.Ct. at 1519. The State asserts that § 120.190(1) prevents actual and perceived corruption by immediately notifying the public of any possible allegiance a particular candidate

may feel toward the publisher. The State also asserts that it provides the Registry with a method of detecting those expenditures which are not truly independent by providing a paper trail to detect violations by unscrupulous PACs routing expenditures through individuals. Under *Buckley* these are both substantial governmental interests. *Buckley,* 424 U.S. at 66–68, 96 S.Ct. at 657–58.

*Kentucky Right to Life, Inc. v. Terry,* 108 F.3d 637, 647–48 (6th Cir.1997).

■ In *Kentucky Right to Life,* the court found that a disclosure which simply stated who paid for the advertisement "was narrowly tailored toward achieving those goals." *Id.* The governmental interests asserted in *Kentucky Right to Life* are the same as those asserted by the FEC in the present case. The disclaimer used by the Fund in the present case is the same as that upheld in *Kentucky Right to Life.* Of course, 2 U.S.C. § 441d(a) requires the additional disclaimer as to whether or not the advertisement is authorized by a candidate. Thus, the question is whether the disclaimer provision of 2 U.S.C. § 441d(a) is more broad than necessary to achieve the Government's interests. The Court finds that the disclaimer requirement is overly broad. The disclosure used by Defendants which stated that the ads were paid for by Public Citizen is sufficient to accomplish all of the goals asserted by the government, especially when considered in conjunction with the reporting requirements of the FECA. The requirement that a party make an additional disclaimer as to whether the communication was authorized by any candidate or candidate's committee is unnecessary to accomplish the stated governmental objectives.[2] The additional requirement is violative of the Defendants' First Amendment rights and is not enforceable against them.

**2.** The present case is distinguishable from *FEC v. Survival Education Fund, Inc.,* 65 F.3d 285 (2d Cir.1995) relied upon by the FEC. In that case, the court addressed disclosures in

the context of solicitations for contributions. The interests being protected in the solicitation context are different from those involved in an advertising campaign.

Therefore, Defendants are entitled to summary judgment as to Counts Three and Four.

In Counts Five, Six, and Seven, the FEC alleges that Defendants' May solicitation letter failed to make various disclosures required by the FECA. In Count Five, the FEC contends that the letter violates 2 U.S.C. § 441b(b)(3)(B) and its implementing regulation, 11 C.F.R. § 114.5(a)(3) by failing to inform solicitees of the political purposes of the Fund. The May letter states:

So, Public Citizen is now forming a *citizen's campaign* fund.

Using this fund, Public Citizen will designate the very worst abusers—the five politicians who take full advantage of the current corrupt political system and unashamedly block reform—- and will inform voters of why they should be defeated.

*Public Citizen's Campaign Fund will counteract the lobbyists' political action committees (PACs) that shovel money at members of Congress.*

\*   \*   \*   \*   \*   \*

As long as members of Congress believe they are secure in their positions of power, they will not push through the reforms our democracy so desperately needs.

When these politicians realize that they will lose their seats if they stand in the way of progress, *Public Citizen will stand a much better chance of pushing through the necessary changes.*

This summer, the "Vote 'em Out!" Campaign will target five of the worst incumbents—the politicians who have taken huge amounts of special interest money, taken numerous trips paid for by lobbyists, voted for pay raises, and who have blocked true campaign finance reform. After the primaries, the money from the "Vote 'em Out!" Fund will be used to alert citizens about why they should vote out these politicians.

The "Vote 'em Out!" Campaign will follow the incumbent and will use everything—T.V., radio, door-to-door canvass-

ing—*to let their constituents know what their members of Congress have been up to for the past few years.*

(Complaint, Attachment 1, pp. 1–2.)

■ The Court is uncertain how Defendants could have been more explicit in stating the political purpose of their solicitation. The letter is clearly not violative of 2 U.S.C. § 441b(b)(3)(B). Accordingly, Defendants are entitled to summary judgment as to Count Five.

Count Six alleges that the May letter violates 2 U.S.C. § 441b(b)(3)(C) and its implementing regulation 11 C.F.R. § 114.5(a)(4) by failing to inform solicitees of their right to refuse to contribute to the Fund without any reprisal. Defendants do not deny that they failed to make this disclosure, but argue that this provision is not applicable to a non-profit group such as Public Citizen.

The FECA requires that contributions or expenditures by national banks, corporations, and labor organizations be made through a separate segregated fund to be utilized for political purposes. In connection with the authorization for the establishment of a separate segregated fund, the law restricts the persons who can be solicited for this fund. 2 U.S.C. § 441b(b)(4)(A). The close connection between the solicitor and the potential solicitees justifies a requirement that the solicitees be informed that they can refuse to contribute without any reprisal.

Defendants argue that though this justification exists for separate segregated funds created by for-profit corporations and labor organizations, the justification has no applicability to a non-profit group such as Public Citizen.

The plain thrust of the "no reprisal" disclaimer is to prevent organizations with economic leverage over employees or members from using that leverage to coerce involuntary donations. Public Citizen is a purely voluntary organization. Membership is typically solicited by direct mail, and a person may join the organiza-

tion by paying $20. The organization controls no benefits which could be denied to its individual members. Thus, it is in no position to impose reprisals upon its solicitees.

■ To require a "no reprisal" disclaimer seems nonsensical in this instance. As the court did in *FEC v. Mass., Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), this Court chooses to narrowly construe the requirement of 2 U.S.C. § 441b(b)(3)(C) such that a "no reprisal" disclaimer is not required in a solicitation by a non-profit membership organization such as Public Citizen. Based on this conclusion, Defendants are entitled to summary judgment as to Count Six.

■ Count Seven alleges Defendants violated 2 U.S.C. § 441b(b)(3)(C) and its implementing regulation, 11 C.F.R. § 114.5(a)(2) which requires that when a corporation suggests contribution guidelines in a letter soliciting contributions to its separate segregated fund, the solicitation must inform the persons being solicited that the guidelines are merely suggestions and that the person is free to contribute more or less than the guidelines suggest. The May letter included a return card which offered four choices for those persons wishing to make a contribution: "$20, $40, $50, OTHER." The Court finds that the provision of an "OTHER" alternative for the solicitee makes it clear that the suggested amounts were suggestions only. Therefore, the letter does not violate FECA. Defendants are entitled to Summary Judgment as to Count Seven.

Counts Eight and Nine raise similar objections to the October, 1992 solicitation letter. Again, the FEC contends that the letter does not apprise recipients of the "political purposes of the solicitation." The October letter states:

*Due to your response to Ralph Nader's request for support of the "Vote 'em Out!" Campaign we were able to take on Gingrich— the second most powerful House Republican—- and bring him to the doorstep of defeat.*

  *&ast;  &ast;  &ast;  &ast;  &ast;  &ast;*

*Drawing from this success, we now need your help again to tackle nine other House members who have not only taken advantage of our current campaign finance system, but who have also fought against reform.*

In the campaign against Gingrich in Georgia, we only spent $60,000 against his warchest of over $1,000,000.00.

Our combined media/grass roots strategy delivered our message in a cost-effective way: our television ads reached tens of thousands of voters while our outreach efforts identified thousands of anti-Gingrich voters and mobilized them to the polls on election day.

 &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

We now want to use this same strategy to target these nine members of Congress. I've enclosed a brochure outlining which members we want to defeat.

(Complaint, Attachment 7, pp. 1–2.)

■ As with the May letter, the Court finds the October letter clearly states the political purpose of the solicitation. Therefore, Defendants are entitled to summary judgment as to Count Eight of the Complaint.

Count Nine alleges the October letter violated 2 U.S.C. § 441b(b)(3)(C) and its implementing regulation 11 C.F.R. § 114.5(a)(4) by soliciting a contribution to a separate segregated fund without advising the solicitees of their right to refuse to contribute to the separate segregated fund without any reprisal. For the same reasons Defendants are entitled to summary judgment as to Count Six, Defendants are also entitled summary judgment as to Count Nine.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [22–1] is hereby **GRANTED** and Plaintiff's Motion

for Summary Judgment [23–1] is hereby **DENIED.**