**YES FOR LIFE POLITICAL ACTION COMMITTEE, Plaintiff**

v.

**Peter B. WEBSTER, et al., Defendants**

**No. CIV. 99–318–P–H.**

United States District Court,
D. Maine.

Oct. 29, 1999.

James Bopp Jr., Raeanna S. Moore, Bopp, Coleson & Bostrom, Terre Haute,

IN, John A. McArdle, III, Campbell & McArdle, P.A., Portland, ME, for Plaintiff.

William R. Stokes, Phyllis Gardiner, Assistant Attorney General, Augusta, ME, for Defendants.

## MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION

HORNBY, Chief Judge.

Maine election laws require that when a political action committee ("PAC") spends money on advocacy concerning a ballot measure, the message must also say "Authorized by" the PAC, giving its name and address. *See* 21–A M.R.S.A. § 1055 (West Supp.1998). If it is broadcast, the broadcaster must ensure that the name and address of the PAC that paid for the political message are disclosed, along with the additional statement: "A copy of our Report is available from and may be viewed at the office of the Commission on Governmental Ethics and Election Practices." *Id.* Violation of the law results in a civil penalty of up to $100. *See id.* I conclude that under United States Supreme Court precedent, the required disclosure of the PAC's identity in political messages concerning a noncandidate ballot measure violates the First Amendment.

The plaintiff in this lawsuit is Yes For Life Political Action Committee ("Yes for Life"), an organization whose purpose is to spend money on advocacy about ballot measures. It wants to run radio or television advertisements and to distribute printed handbills—all without the required disclosures—urging voters to ban so-called "partial birth abortion" in an election on November 2, 1999.[1] It has sued the members of the Maine Commission on Governmental Ethics and Election Practices ("Commission"), the Secretary of State, the Attorney General and various District Attorneys to enjoin enforcement of the disclosure provision. Yes For Life claims that the required disclosures violate its First Amendment rights in two ways: first, that the Supreme Court has held that a speaker in a noncandidate election has a constitutional right to speak anonymously; and second, that the required disclosures are too long and, as a result, infringe on the amount of speech in a radio advertisement.[2] The State defends the statute as a legitimate means of disclosing to the electorate just who is financing efforts to influence the vote in a public election.

Until 1993, Maine did not require disclosure of who "authorized" a radio/television advertisement or handbill/flyer. *See* 21–A M.R.S.A. § 1055 (West 1993), *amended by* 1993 Me. Laws ch. 352 § 5 (*codified at* 21–A M.R.S.A. § 1055 (West Supp.1998)). Instead, a PAC had to disclose the name and address of who made or financed expenditures for the advertisement or handbill. *See id.* In the case of a broadcast advertisement, the broadcaster also was responsible for ensuring announcement of the name and address of the PAC that made or financed the expenditure for the advertisement and, in addition, the issuance of the statement I have quoted about availability of the PAC report. *See id.* I have been unable to determine from the legislative history exactly why in 1993 the Legislature added the "authorized by" requirement.[3] Literature concerning other states suggests both that requiring disclosure of sponsorship (or conversely that a particu-

---

1. Yes For Life has limited its attack to printed materials it might distribute, and radio and television advertising.

2. The second argument does not apply to printed materials and, since a visual statement will suffice in a television advertisement and thereby not infringe on the time, it does not apply to television advertising either.

3. At oral argument, the State's lawyer hypothesized that the additional language may have been devised to deal with "in-kind contributions"—that when one PAC purchased broadcast advertising time and contributed it to another PAC, which then used it, the second PAC would not have been subject to mandatory disclosure in the broadcast without the additional provision.

lar individual or PAC was *not* associated with an advertisement) had been around for a long time, *see generally* Erika King, comment, *Anonymous Campaign Literature and the First Amendment*, 21 N.C. CENT. L.J. 144, 145–50 (1995), and that there was a general campaign reform effort countrywide in the early 1990's, designed to respond to negative campaign advertising, *see* Malcolm A. Heinicke, *A Political Reformer's Guide to McIntyre and Source Disclosure Laws for Political Advertising*, 8 STAN. L. & POL'Y REV. 133, 139 (1997); Timothy J. Moran, *Format Restrictions on Televised Political Advertising: Elevating Political Debate Without Suppressing Free Speech*, 67 IND. L.J. 663, 677–80 (1992). Prior to 1993, Maine had a disclosure requirement as to who "authorized" a statement in candidate elections, *see* 21–A M.R.S.A. § 1014 (West 1993), but not for PACs in issue-only elections.

In any event, in 1995, the United States Supreme Court held that an Ohio statute that prohibited distribution of anonymous campaign literature violated the First Amendment. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Among other things, the Court pointed out that the Federalist Papers, essential advocacy documents in the public debate leading up to ratification of the Constitution, had largely been published anonymously. *See id.* at 343 n. 6, 115 S.Ct. 1511. The Court concluded from that fact and many others that there was a rich tradition of First Amendment protection for anonymous political discourse in this Republic, and observed that unpopular viewpoints would often not be expressed if attribution were always required. *See id.* at 342–43, 115 S.Ct. 1511. Then, in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S.Ct. 636, 645–46, 142 L.Ed.2d 599 (1999),[4] the Court found unconstitutional the requirement that a petition circulator wear a badge identifying who he/she was, again highlighting the constitutional values of anonymous speech under the First Amendment. Following *McIntyre*, attribution requirements like Maine's have been struck down in Arkansas, Indiana, Louisiana, Missouri and West Virginia.[5]

4. I shall refer to this case as *"Buckley II"* so as to distinguish it from *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (examining the constitutionality of several provisions of the Federal Elections and Campaign Act of 1971).

5. *Arkansas Right to Life State PAC v. Butler*, 29 F.Supp.2d 540 (W.D.Ark.1998) (enjoining enforcement of Arkansas statute requiring that "[a]ny person making an independent expenditure shall name and identify itself ... in all of its communications with the public concerning any candidate and such communications must include ... the following notice: 'This communication is not authorized by any candidate or candidate committee.' "), *cert. denied*, —— U.S. ——, 119 S.Ct. 1041, 143 L.Ed.2d 48 (1999); *Stewart v. Taylor*, 953 F.Supp. 1047 (S.D.Ind.1997) (declaring unconstitutional Indiana statute that required that political advertising or material must include the "following statement or the equivalent: 'Paid for by ___ (insert the name of the individual who paid for the advertisement and, if the advertisement is paid for by an organization or committee, include the name of the chairman or treasurer of the organization or committee) and (if presented in support of a candidate or more than one (1) candidate) presented ___ (insert either 'with' or 'without') the approval of ___ (insert the name of each candidate) ...'")); *State v. Moses*, 655 So.2d 779 (La.App.1995) (declaring unconstitutional Louisiana statute that required that if an entity is "responsible" for "any statements relative to candidates or proposition" that the statements include "thereon the name of the [entity] and the full and correct name and address of its chairman or other chief administrative officer and whether or not [the entity] supports or opposes such candidate or proposition"); *Shrink Missouri Government PAC v. Maupin*, 892 F.Supp. 1246 (E.D.Mo.1995) (permanently enjoining enforcement of a Missouri statute that provided that "any printed or broadcast matter ... which contains allegations regarding the actions, inactions, beliefs, behavior or other aspects of any candidate for office which issued such printed broadcast matter, shall contain ... a statement that ... the information contained in the advertisement has been approved by the candidate ..."); *West Virginians for Life, Inc. v. Smith*, 960 F.Supp. 1036 (S.D.W.Va.1996) (declaring unconstitutional West Virginia statutes that pro-

■ The implications for this case are clear. The requirement that a PAC identify itself as having "authorized" the political speech it makes is unconstitutional.[6] It is parallel to the Ohio provision that the Supreme Court struck down in *McIntyre*.[7] It runs directly afoul of the Supreme Court's ruling that anonymity of an author of political speech is protected by the First Amendment.

But the Supreme Court also has acknowledged that the state has a legitimate interest in letting the voters know about the source and amount of money spent in support of or in opposition to a ballot initiative. *See Buckley II*, 525 U.S. at ——, 119 S.Ct. at 647; *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299–300, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). With the authorization language stricken, the Maine statute still requires a PAC to identify itself when it *paid for* the speech. The State argues that its interest in letting the voters know where the mon-

hibit "the publication, distribution, or dissemination of a scorecard, voter guide, or other *written analysis of a candidate's position* within sixty days of the election unless the document includes the name of the party responsible for it" and "the publication, issuance or circulation of any anonymous letter, circular, or other publication, tending to influence voting at any election"). In *FEC v. Public Citizen, Inc.*, a federal court recently struck down a federal law's "requirement that a party make an additional disclaimer as to whether the communication was authorized by any candidate. . . ." *Public Citizen, Inc.*, 64 F.Supp.2d 1327, 1336 (N.D.Ga.1999) (reviewing 2 U.S.C. § 441d(a)). In Vermont, the court was sufficiently troubled by the constitutional issue that it limited the attribution rule to candidate elections and held that it would not apply to ballot questions like those at issue in the upcoming November Maine election. *See Vermont Right to Life Committee, Inc. v. Sorrell*, 19 F.Supp.2d 204 (D.Vt. 1998). *Accord Virginia Society for Human Life, Inc. v. Caldwell*, 152 F.3d 268 (4th Cir. 1998).

Only in Florida and Kentucky have such requirements been upheld. · *See Doe v. Mortham*, 708 So.2d 929 (Fla.1998) (upholding with modifications a Florida statute requiring that "[a]ny political advertisement paid for by an independent expenditure shall prominently state 'Paid political advertisement paid for by (Name of person or committee paying for the advertisement) independently of any (candidate or committee),' "; and requiring that "Any political advertisement and any campaign literature published, displayed, or circulated prior to, or on the day of, any election shall: (a) 'Be marked paid political advertisement'. . . . (b) Identify the persons or organizations sponsoring the advertisement); *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.1997) (upholding a Kentucky statute requiring that all written or broadcast political advocacy in candidate elections "be identified by the words 'paid for by' followed by the name and address of the payer"), *cert.*

denied *sub nom., Kentucky Right to Life, Inc. v. Stengel*, 522 U.S. 868, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). The Kentucky case, however, is distinguishable. The Court sustained the statute there because of the fear of corruption—that the voters need to know if a candidate has been supported by an organization so as to watch for any *quid pro quo*. That risk is not present in an issue-only election.

6. *McIntyre* was concerned with protecting the anonymity of the "author" of the speech. The Maine statute requires disclosure of who "authorized" a statement. Is there a difference? In part, yes. One can certainly "authorize" the publication of a statement "authored" by someone else. But *McIntyre* would have reached the same conclusion protecting anonymity for Mrs. McIntyre even if the text of the handbills had actually been composed (authored) by, say, Mrs. McIntyre's teenaged son and then distributed by her as (authorized) statements. Likewise, in *Buckley II*, the petition circulators were entitled to anonymity without any discussion of whether they had individually "authored" the text of the petition for which they were gathering signatures. Moreover, in the context of an association, authorization often amounts to "authorship." I shall therefore treat authorization and authorship as equivalent for purposes of this decision.

7. *Compare* 21–A M.R.S.A. § 1055 ("the communication must clearly and conspicuously state the name and address of the political action committee that authorized, made or financed the expenditure for the communication and that the communication has been authorized by the political action committee"), with Ohio Rev.Code Ann. § 3599.09(A) (1988) (requiring "the name and *residence or business address* of the chairman, treasurer, or secretary of the organization issuing the [advocacy], or the person who issues, makes, or is responsible therefor [sic]").

ey comes from justifies requiring that identification in the written and broadcast messages that PACs send. Yes for Life, on the other hand, argues that any informational requirements approved by the Supreme Court are limited to before- or after-the-fact disclosures to state authorities like the Maine Commission, as opposed to on-the-spot identification while the message is being delivered—identification that *McIntyre* and *Buckley II* struck down.

The Supreme Court's approving references to a state's interest in informing the public of the source and amount of money spent on ballot initiatives have indeed been in the context of general disclosures to state authorities rather than mandated disclosures contemporaneous to a particular controversial message. Thus, in *Berkeley,* the Supreme Court stated: "The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed." 454 U.S. at 299–300, 102 S.Ct. 434. In *Buckley II* as well, the Court's references to information about sources and amount of money were in the context of disclosures to state regulatory authorities, not as attachments to First Amendment communications. Although the Supreme Court stated explicitly in *Buckley II* that it was not deciding whether a state could require petition gatherers to identify who "paid for" the project, *see* 525 U.S. at ——, 119 S.Ct. at 645 ("The Court of Appeals did not rule on the constitutionality of

other elements of the badge provision, namely the 'requirement that the badge disclose whether the circulator is paid of a volunteer, and if paid, by whom.' Nor do we." (citations omitted)), I cannot conclude that *McIntyre* and *Buckley II,* read together, mean only that Mrs. McIntyre could be required to state on her circular "paid for by Mrs. McIntyre," rather than "authored by Mrs. McIntyre." [8]

■ The State has argued that I should limit *McIntyre*'s protection to individual speakers like Mrs. McIntyre and not include associations like Yes for Life Political Action Committee. *McIntyre* did concern an individual, and from time to time in the opinion the Court talked about such factors as "a *personally* crafted statement of a political viewpoint," "the content of *her* thoughts on a controversial issue," and "information that a *person* prefers to keep secret," 514 U.S. at 355, 115 S.Ct. 1511 (emphasis added), references directed to individual speakers. At other times, however, the Court spoke more generally, defining the question as "whether an Ohio statute that prohibits the distribution of anonymous campaign literature is a 'law ... abridging the freedom of speech' within the meaning of the First Amendment," *id.* at 336, 115 S.Ct. 1511, referring to the statute's requirement that what must be disclosed was "the name and residence or business address of the chairman, treasurer, or secretary of the *organization* issuing

8. *See Stewart,* 953 F.Supp. 1047 (invalidating Indiana statute requiring disclosure of who paid for a political advertisement); *cf. Arkansas Right to Life State PAC v. Butler,* 29 F.Supp.2d 540 (striking down an Arkansas statute that required "[a]ny person making an independent expenditure" to "name and identify itself"), *cert. denied,* —— U.S. ——, 119 S.Ct. 1041, 143 L.Ed.2d 48 (1999); *Vermont Right to Life Comm., Inc.,* 19 F.Supp.2d at 204 (construing, because of First Amendment concerns, Vermont's "paid for by" disclosure requirement to apply only to candidate elections); *West Virginians for Life, Inc.,* 960 F.Supp. at 1041–42 (invalidating a West Virginia statute mandating identification of those "responsible" for the advocacy); *Moses,* 655

So.2d 779 (striking down a Louisiana statute that required identity disclosure of those "responsible for ... the distribution or transmission of any statements relative to candidates or proposition"). *But see Public Citizen, Inc.,* 64 F.Supp.2d at 1336 ("The disclosure used by Defendants which stated that the ads were paid for by Public Citizen is sufficient to accomplish all of the goals asserted by the government"); *Doe v. Mortham,* 708 So.2d 929 (embracing Florida's various "paid for" requirements unless they pertain to individual pamphleteering or require identification of independent advertisements made by individuals). Missouri's "paid for" requirement was not challenged in *Shrink Missouri Government PAC,* 892 F.Supp. at 1254–55.

the same, or the person who issues, makes, or is responsible therefor [sic]" *id.* at 345, 115 S.Ct. 1511 (emphasis added), and quoting approvingly from *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776–77, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), a case that gave protection to corporate speech, *see id.* at 347, 98 S.Ct. 1407. In *Bellotti* itself, the Court made clear that "[t]he proper question ... is not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [the statute in question] abridges *expression that the First Amendment was meant to protect.*" 435 U.S. at 776, 98 S.Ct. 1407 (emphasis added). In still another case dealing with corporate speech, *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Court pointed out that the state has less regulatory authority over political action groups (even those that are incorporated) because they are distinct from ordinary business corporations, inasmuch as they—like Yes for Life PAC—are organized for the specific purpose of taking a political position, have no shareholders or other persons with a claim on their assets or earnings, and are much more independent from the influence of business corporations. *See* 494 U.S. at 662–64, 110 S.Ct. 1391. Consequently, if indeed the *McIntyre* Court meant to distinguish between individuals and other entities like corporations—a determination that cannot be made from the text of the opinion—I conclude that Yes for Life Political Action Committee is much more like an individual than a corporation and is entitled to the same First Amendment protections as the Court granted to Mrs. McIntyre. However one approaches it, this is core political

speech. Under *McIntyre* the statute is subject to "exacting scrutiny" under the First Amendment to ensure that it is "narrowly tailored" to an "overriding state interest." 514 U.S. at 347, 115 S.Ct. 1511. This statute does not meet that test. I conclude that as long as *McIntyre* is binding precedent, Maine may not constitutionally require a PAC to identify itself in advocacy materials it authorizes or pays for.[9]

I recognize that many people find anonymous statements on controversial issues to be repugnant. Of course, the voters are free to discount or ignore anonymous messages as not worthy of their consideration. Undoubtedly most reputable organizations will continue to identify themselves in any political messages they issue in connection with a ballot initiative. But what the Constitution protects and what good judgment or good policy permits are often two entirely different things. The Supreme Court has ruled that under the First Amendment anonymous political messages deserve protection because in some important instances the face of an unpopular speaker will otherwise interfere with the legitimacy of the political message he/she is sending. Ultimately, it is up to the voters to assess the message and what weight to give to it.

■ My decision to this point has dealt with the first paragraph of section 1055, which imposes its obligations on a PAC itself. The constitutional question is on a motion for preliminary injunction.[10] I therefore make the following additional findings required under First Circuit precedent in connection with issuing a preliminary injunction: under the analysis I have given, the plaintiff has an overwhelming likelihood of success on the merits as I

9. All of the cases I have cited that have struck down attribution requirements or disclaimers of who paid for the message have treated PACs like Mrs. McIntyre the individual.

10. The State defendants resisted consolidating the trial on the merits with the preliminary injunction hearing held on October 28.

Because of the very short time frame between the time the lawsuit was filed and the election, I DENY the plaintiff's motion to consolidate, concluding that it would be unfair to force the State to final trial before the election.

have described them concerning self-identification by PACs; there is irreparable injury to the plaintiff if I do not award preliminary injunctive relief because its First Amendment interests are at stake in an election that is imminent; the balance of harms as to those issues favors the plaintiff; and the public interest is served by the preliminary injunction given the First Amendment interests at stake.

The second paragraph of section 1055 imposes requirements on broadcasters when they broadcast a political message from a PAC.[11] I am uncomfortable with the posture of this case as it pertains to the language required of broadcasters. Yes for Life's lawyer conceded at oral argument that it could not make the case for preliminary injunctive relief against the requirement that PACs be identified in broadcast advertising because the Federal Communications Commission ("FCC") requires that disclosure in any event. *See* 47 C.F.R. § 73.1212 (radio and television broadcasts); 47 C.F.R. § 76.221 (cable). Consequently, whatever might be the ultimate merits of Yes for Life's attack on the Maine statutory requirement, I DENY preliminary injunctive relief as to the requirement that the PAC that made or financed the expenditure for the advertisement be identified by the broadcaster in the broadcast message. Irreparable injury, balancing of harm and serving the public interest can hardly be met where the activity would continue (as it would here) despite this Court's preliminary decree. Identification of a PAC's *address* is an additional Maine statutory requirement that is not contained in the FCC regulations. Ultimately it may not be defensible as a matter of Supreme Court First Amendment law as I have analyzed it, but I am also not persuaded on this record

that broadcasters might not independently require disclosure of the address in any event. Finally, Maine's additional requirement of a statement concerning the location and availability of the PAC report is directed not at political action committees but at broadcasters, and imposes its infraction sanction upon the broadcasters. Thus, Yes for Life as a PAC faces no threat of legal enforcement action if the extra language is omitted. Yes for Life argues that, because of the statute, broadcasters require PACs to include the required statement and charge extra advertising time accordingly, but the record does not demonstrate that proposition as it currently stands. For all I know on this record, radio broadcasters would independently require such a statement in any event. At this stage of the case, therefore, I do not find that the plaintiff has demonstrated irreparable injury or that the balance of harms favors the plaintiff or that the public interest is served by granting an injunction concerning the requirement that broadcasters identify either the PAC's address or the location and availability of the PAC report in a broadcast.

Accordingly, it is hereby ORDERED that the plaintiff's request for a preliminary injunction is GRANTED as follows: The defendants are PRELIMINARILY ENJOINED from enforcing 21–A M.R.S.A. § 1055 to the extent that it requires a political action committee that makes an expenditure to finance a communication expressly advocating the promotion or defeat of a ballot question to indicate in the communication that the communication has been authorized or paid for by that political action committee.[12] No security is required under Fed. R.Civ.P. 65(c).

---

**11.** At oral argument, the parties disclaimed any argument that FCC regulations preempt Maine's statutory attempt to govern political broadcasting. *See* Joint Agency Guidelines for Broadcast Licensees re Political Broadcasting, 69 F.C.C.2d 1129 (June 19, 1978) (preempting such requirements in candidate

elections). I cannot find any similar federal intent to preempt state requirements in ballot initiatives.

**12.** Section 1055 states that its enforcement is governed by 21–A M.R.S.A. § 1062–A. Section 1062–A(9) assigns responsibility for en-

The Clerk's Office shall schedule a conference of counsel, following the election, with me or the Magistrate Judge to define what remains of the case for trial and/or final judgment.

So Ordered.

forcement to the Secretary of State, initially, and then to the Attorney General. *See* 21–A M.R.S.A. § 1062–A (West Supp.1998). It would appear, therefore, that the State District Attorneys have no section 1055 enforcement authority. However, the State has not raised this issue, and the preliminary injunction accordingly extends to all the defendants.